IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **CYNTHIA L. SYDOW,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil No. 14-cv-073-SMY-CJP** |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM and ORDER

**YANDLE, District Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff Cynthia L. Sydow seeks judicial review of the final agency decision denying her application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) benefits pursuant to 42 U.S.C. § 423.

## Procedural History

Plaintiff applied for benefits in January, 2010, alleging disability beginning on November 4, 2005.  (Tr. 20).  After holding an evidentiary hearing, ALJ Dina R. Loewy denied the application in a written decision dated August 8, 2012.  (Tr. 20-27).  The Appeals Council denied review, and the decision of the ALJ became the final agency decision.  (Tr. 1).  Administrative remedies have been exhausted and a timely complaint was filed in this Court.

## Issues Raised by Plaintiff

Plaintiff raises the following points:

1.  The ALJ's RFC assessment was erroneous because it did not account for new evidence presented to the Appeals Council, did not include all limitations supported by the evidence, and did not properly weigh the medical opinions.

1

2.      The ALJ failed to properly evaluate plaintiff's credibility.

### Applicable Legal Standards

To qualify for DIB or SSI, a claimant must be disabled within the meaning of the applicable statutes.[1]   For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."   42 U.S.C. §423(d)(1)(A).

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.  42 U.S.C.  §423(d)(3).  "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit.  20 C.F.R. §§ 404.1572.

Plaintiff applied for DIB and SSI.   For a DIB claim, a claimant must establish that she was disabled as of her date last insured.  *Stevenson v. Chater*, 105 F.3d 1151, 1154 (7th   Cir. 1997). It is not sufficient to show that the impairment was present as of the date last insured; rather plaintiff must show that the impairment was severe enough to be disabling as of the relevant date. *Martinez v. Astrue*, 630 F.3d 693, 699 (7th Cir. 2011).

Social Security regulations set forth a sequential five-step inquiry to determine whether a

---

[1]  The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404.   The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416.   As is relevant to this case, the DIB and SSI statutes are identical.  Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations.   Most citations herein are to the DIB regulations out of convenience.

claimant is disabled.  The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience.  20 C.F.R. §§ 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-513 (7th Cir. 2009.

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three.  If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job.  *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th  Cir. 1984).  *See also Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001) (Under the five-step evaluation, an "affirmative answer

leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled…. If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made.   It is important to recognize that the scope of review is limited.   "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g).   Thus, this Court must determine not whether Ms. Sydow was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. See, *Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)).

The Supreme Court has defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."   *Richardson v. Perales*, 91 S. Ct. 1420, 1427 (1971).   In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ.   *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997).   However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner.   See, *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

## The Decision of the ALJ

ALJ Loewy followed the five-step analytical framework described above.   She determined that plaintiff was insured for DIB only through September 30, 2011, and that she had

not been engaged in substantial gainful activity since the alleged onset date.   The ALJ found that plaintiff had severe impairments of psoriatic and degenerative arthritis.[2]   She further determined that these impairments do not meet or equal a listed impairment.

The ALJ found that Ms. Sydow had the residual functional capacity (RFC) to perform work at the light exertional level, with some physical limitations.   Based on the testimony of a vocational expert, the ALJ found that plaintiff was able to do her past   work as a postal clerk.

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order.   The following summary of the record is directed to the points raised by plaintiff and is confined to the relevant time period.

### 1.    Agency Forms

Plaintiff was born in 1959, and was almost 45 years old on the alleged onset date of November 4, 2005.  (Tr. 190).  She was insured for DIB through September 20, 2011.  (Tr. 191).

Plaintiff said she was unable to work because of arthritis in her back, elbows, knees and hips.   She was fired from her post office job because of "usage of sick leave."  (Tr. 209-210). She had a high school education.   (Tr. 210).

In February, 2010, plaintiff filed an Activities of Daily Living Report in which she said she lived with her family.   She cooked simple meals and did some household chores such as laundry, dishes and dusting.   She spent about 5 or 6 hours a day watching TV.   She claimed difficulty

---

[2] "Psoriatic arthritis is a form of arthritis that affects some people who have psoriasis — a condition that features red patches of skin topped with silvery scales." http://www.mayoclinic.org/diseases-conditions/psoriatic-arthritis/basics/definition/con-20015006, accessed on March 18, 2015.

doing things such as lifting, squatting and bending.   She said she could only stand or walk for about 30 minutes.   If she overexerted herself, it took a day or two to recover.   (Tr. 236-243).

### 2.   Evidentiary Hearing

Ms. Sydow was represented by an attorney at the evidentiary hearing on April 19, 2012. (Tr. 35).

Plaintiff testified that she was 52 years old and lived with her husband and adult children. She sometimes babysat her 6 year old granddaughter, who also lived in the house.   She was on her husband's health insurance.   (Tr. 41-42).

She worked at the post office for about 20 years.   She was a mail processing clerk.   She was fired for calling in sick too many times.   (Tr. 43-44).

Ms. Sydow testified that "in the last year, it just has been downhill."   She said she did not do much anymore.   She tried to do some housework.   (Tr. 46-47).   She said that she was unable to work because she had psoriatic arthritis.   This caused "pus balls" on her hands and feet.   She had them "constantly" and there was nothing that could be done for them.   It was very painful to grasp anything or to walk.   The pus balls would dry up and go away, and then come back.   She was very tender.   Plaintiff described the feeling as "it just throws you through the ceiling if something touches it or I touch something."   She showed the ALJ her hand, and the ALJ said she did not see anything.   Plaintiff's counsel described it as "little white dots on her hands."   (Tr. 48-51).

About 5 weeks before the hearing, she started taking Enbrel, prescribed by Dr. Brasington. She said that was for the joint inflammation, but not for the psoriasis.   (Tr. 52).   She also took Celebrex if she really needed it.   (Tr. 54).   Enbrel caused her to have no energy.   (Tr. 55).

A vocational expert (VE) testified that plaintiff's past work as a postal clerk was semi-skilled and was generally performed at the light exertional level, although it had been performed by her at the heavy exertional level.   (Tr. 59).   The ALJ asked her to assume a person of plaintiff's age and education who was able to do work at the light exertional level, limited to only occasional climbing of ramps, stairs, ladders, ropes and scaffolds, and only occasional balancing, stooping, kneeling, crouching, and crawling. The VE testified that this person would be able to do plaintiff's past work as a postal clerk as that job is generally performed.    (Tr. 60-61).

### 3.    Medical Treatment

Plaintiff was treated by Dr. Donald Bassman in 2003 and 2004 for pain in her knees.   The diagnosis was degenerative joint disease.   He noted that she had a history of psoriatic arthritis. There are no notations of any skin lesions.   (Tr. 387-393).

Dr. Phillip Chu was plaintiff's primary care physician.   In August, 2005, she saw him for left knee pain.   The diagnosis was degenerative joint disease.   He prescribed Celebrex.   She also had a plantar wart on her left foot.   (Tr. 577-578).   Dr. Chu did not see plaintiff at all between November, 2005, and May, 2006, when he saw her for a broken toe.   He next saw her in May, 2007, for lumps under her right arm.   There was another gap in treatment from January, 2008, through March, 2009.   In Dr. Chu's records through November, 2009, there were no notations of skin lesions from psoriasis.   (Tr. 555-579).   In March 2009, Dr. Chu referred her back to Dr. Bassman for left knee pain.   (Tr. 560).

On December 3, 2009, Dr. Bassman aspirated fluid from plaintiff's left knee.   (Tr. 553). She continued to have swelling of her knee, and went to the emergency room on December 6, 2009.   She and her husband told the doctor that she had "about 5 episodes during the past 10 years

7

of having a flare-up of skin changes on her palm, which is some sort of variant of psoriasis."   Her skin was "intact" on that date.   (Tr. 381-382).   She was admitted to the hospital for possible septic arthritis.   More fluid was aspirated from her left knee, which was positive for multiple white cells but no organisms.   Dr. Kevin Baumer then performed arthroscopic irrigation and debridement of the left knee.   (Tr. 376-378).

While plaintiff was in the hospital, she was seen by Dr. Humayun Beg, a rheumatologist. He noted that she had been treated in the past with methotrexate, but had not had any treatment for her psoriatic arthritis or psoriasis in the past two years.   She complained of significant skin psoriasis on her hands and feet.   Dr. Beg did not note any current plaques or pustules.   (Tr. 347-348).

Dr. Baumer saw plaintiff in his office on December 17, 2009.   Her knee was doing much better.   He noted that her "skin lesions from her psoriasis are doing well."   (Tr. 374).   On January 7, 2010, her excision was well-healed and she had minimal swelling.   She had good extension of the left knee and the lesions on her hand had "pretty much resolved."   Dr. Baumer recommended that she follow up with Dr. Beg for medical management of her psoriatic arthritis. (Tr. 373).

Dr. Beg saw plaintiff in his office on January 13, 2010.   She was doing much better with her knee, although she complained of some pain on ambulation.   She did not have any skin lesions or psoriatic plaques.   Dr. Beg ordered some tests.   On February 23, 2010, he prescribed methotrexate and a prednisone taper.   She had no skin lesions or psoriatic plaques.   (Tr. 341-342).   On June 1, 2010, Dr. Beg noted that plaintiff continued to have arthralgias, but her skin psoriasis had resolved.   She was still taking methotrexate.   Dr. Beg increased the dosage and

8

prescribed two weeks of prednisone.   She was to return in eight weeks.   (Tr. 594-595).

The next record from Dr. Beg is dated February 10, 2011.   Although her inflammatory markers were normal and she had no significant arthritic changes except for small enthesopathic changes at the heels and ankles, she complained of "significant arthralgias."   She told Dr. Beg that she was not getting any benefit from methotrexate.   He felt the only other option was treatment with "biologics," which he was unwilling to do while she was still smoking.   She declined to quit smoking.   Dr. Beg discharged her from his care.   (Tr. 599-600).

Ms. Sydow continued to see Dr. Chu at intervals from December, 2009, through August, 2011.   There were no notations of any skin abnormalities.   (Tr. 624-634).   In   August,   2011, plaintiff asked Dr. Chu to refer her to another rheumatologist.   (Tr. 624).

Plaintiff saw Dr. Richard Brasington, a rheumatologist at Barnes Jewish Hospital in St. Louis, Missouri, on December 5, 2011.   She told him that she had 3 to 6 episodes a year of pustular outbreaks on her hands and feet, and that she had never been treated for this and had never seen a dermatologist.   On exam, she had resolving pustular lesions on her left foot with no nail involvement.   Her left knee was swollen and she had some tenderness over the left Achilles tendon.   He concluded that she had mild psoriatic arthritis and some degenerative joint disease. He advised her to increase her use of Celebrex.   (Tr. 648-650).   She returned on December 14, 2011, with a very swollen and painful left knee.   Dr. Brasington aspirated fluid and injected her knee with Kenalog.   His assessment was inflammatory arthritis of the left knee.   He did not think it was infectious.   (Tr. 646-647).

Plaintiff went to the emergency room at Barnes Jewish Hospital with a swollen and painful left knee on February 16, 2012.   Her left knee was aspirated.   No skin lesions or pustules were

9

noted.   (Tr. 676-679).   An x-ray of her left knee showed mild to moderate surgical changes involving the medial and patellofemoral knee compartments and a small suprapatellar effusion. (Tr. 684).

Plaintiff went to the emergency room at Memorial Hospital in Belleville, Illinois, on February 17, 2012, with continued pain and swelling in her left knee.   The diagnosis was inflammatory arthritis.   Her skin had normal color and was warm and dry with no rash.   She was prescribed Prednisone and Vicodin, and told to follow up with her doctor.   (Tr. 706-707).

Ms. Sydow returned to Dr. Brasington on February 23, 2012.   He started her on Enbrel.[3] (Tr. 643).

Dr. Steven Morton performed a second arthroscopic irrigation and debridement on April 30, 2012.   On May 14, 2012, she still had some discomfort, but was getting around better.   There was no effusion in the joint and the knee was stable and "relatively unremarkable."   There was no growth from her cultures and no evidence of infection.   She felt like she was "relatively back to where she was before, normal for her."   (Tr. 720).

Ms. Sydow also followed up with infectious disease specialist Dr. Omer Badahman.   He had seen her in the hospital, and had placed her on a three week course of IV antibiotics after her discharge on May 4, 2012.   On May 17, 2012, her knee swelling had completely subsided.   Her cultures had been negative, but she had clinical symptoms of septic arthritis.   Dr. Badahman told her to stop Vancomycin and start Daptomycin.

Dr. Badahman saw her for the last time on June 7, 2012.   She was doing well.   Her left

---

[3] "ENBREL is grouped within a class of medications called biologic response modifiers, or biologics. By working on the immune system, biologics block proteins that contribute to the disease process." http://www.enbrel.com/what-is-ENBREL.jspx, accessed on March 18, 2015.

knee septic arthritis and catheter-related infection were both resolved.   She had been off antibiotics for ten days and had no signs of an acute infection.   Her left knee had no swelling and the range of motion was intact.   There was no notation of any skin lesions or plaques.   (Tr. 727).

### 4.    Opinions of Treating Doctor

There were no opinions from treating doctors before the ALJ.

### 5.    New Evidence Submitted to the Appeals Council

After ALJ Loewy denied plaintiff's claim, her attorney submitted a report from Dr. Brasington to the Appeals Council in support of her request for review.   The report is dated September 25, 2012.   Dr. Brasington states that plaintiff has psoriatic arthritis which causes symptoms of fatigue, pain and swelling.   He opines that she can sit and stand/walk for less than two hours a day, and that she can lift less than 10 pounds and can never stoop, crouch, bend or climb ladders and stairs.   (Tr. 748-749).

## Analysis

Plaintiff first argues that the ALJ erred in assessing her RFC because she should have included additional limitations that are supported by her testimony and by the opinion of Dr. Brasington.

Dr. Brasington's report was not part of the record that was before the ALJ.   Rather, it was submitted to the Appeals Council after the ALJ had already issued her decision.   Therefore, it cannot be considered by this Court in determining whether the ALJ's decision was supported by substantial evidence.   *Farrell v. Astrue*, 692 F.3d 767, 770 (7th Cir. 2012); *Getch v. Astrue*, 539 F.3d 473, 484 (7th Cir. 2008).

Plaintiff does not argue that the Appeals Council erroneously refused to consider Dr.

11

Brasington's report as new and material evidence pursuant to 20 C.F.R. §404.970(b).   Rather, her argument is, in effect, that the Appeals Council erred in denying review.   See, Doc. 15, pp. 11-12. However, that is an argument that this Court cannot entertain.

Pursuant to 42 U.S.C. § 405(g), a claimant may obtain review in this Court of a "final decision of the Commissioner of Social Security."   When the Appeals Council denies a request for review, as happened here, the decision of the ALJ becomes the final decision of the Commissioner, and it is the decision of the ALJ which is reviewed by this Court.   20 C.F.R. §404.981; *Eads v. Secretary of Dept. of Health and Human Services*, 983 F.2d 815, 816 (7th Cir. 1993).   The decision of the Appeals Council denying review, as opposed to an order refusing to consider additional evidence, is within the discretion of the Appeals Council.   It is not the final decision of the Commissioner, and it is not subject to review by this Court.   42 U.S.C. § 405(g); *Perkins v. Chater*, 107 F.3d 1290, 1294 (7th Cir. 1997).

It is true that the Court may consider the issue of whether an Appeals Council order refusing to consider additional evidence was the result of a mistake of law.   *Farrell*, 692 F3d at 770-771.   Here, plaintiff has not cited *Farrell* and has not argued that the Appeals Council committed a mistake of law.   Accordingly, the Appeals Council order denying review stands, and this Court cannot consider Dr. Brasington's report in reviewing for substantial evidence.

Aside from Dr. Brasington's report, plaintiff's argument regarding the RFC assessment relies mainly on the credibility of her own statements.   Therefore, the Court turns to her argument regarding the ALJ's credibility analysis.

It is well-established that the credibility findings of the ALJ are to be accorded deference, particularly in view of the ALJ's opportunity to observe the witness.   *Powers v. Apfel*, 207 F.3d

431, 435 (7th Cir. 2000).   "Applicants for disability benefits have an incentive to exaggerate their symptoms, and an administrative law judge is free to discount the applicant's testimony on the basis of the other evidence in the case."   *Johnson v. Barnhart*, 449 F.3d 804, 805 (7th Cir. 2006).

SSR 96-7p requires the ALJ to consider a number of factors in assessing the claimant's credibility, including the objective medical evidence, the claimant's daily activities, medication for the relief of pain, and "any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms." SSR 96-7p, at *3.   Social Security regulations and Seventh Circuit cases "taken together, require an ALJ to articulate specific reasons for discounting a claimant's testimony as being less than credible, and preclude an ALJ from 'merely ignoring' the testimony or relying solely on a conflict between the objective medical evidence and the claimant's testimony as a basis for a negative credibility finding."   *Schmidt v. Barnhart*, 395 F.3d 737, 746-747 (7th Cir. 2005), and cases cited therein.

Plaintiff has not advanced a convincing challenge to the credibility determination.   She devoted about two and a half pages of her brief to her argument on this point.   She cites *Martinez v. Astrue*, 630 F.3d 693 (7th Cir. 2011), and *Brindisi v. Barnhart*, 315 F.3d 783 (7th Cir. 2003), for the proposition that the ALJ should not rely on boilerplate language to express her credibility findings.   However, the use of the boilerplate language does not automatically require reversal. It is harmless where the ALJ goes on to support her conclusion with reasons derived from the evidence.   See, *Shideler v. Astrue*, 688 F.3d 306, 310-311 (7th Cir. 2012); *Richison v. Astrue*, 462 Fed. Appx. 622, 625-626 (7th Cir. 2012).

The gist of plaintiff's truncated argument is that the ALJ did not make sufficiently specific credibility findings.   This Court disagrees.

The ALJ is required to give "specific reasons" for her credibility findings and to analyze the evidence rather than simply describe the plaintiff's testimony. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009).   See also, *Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir., 2009)(The ALJ "must justify the credibility finding with specific reasons supported by the record.")

Plaintiff's argument is short on specifics and ignores the fact that ALJ Loewy gave specific reasons for her conclusion that plaintiff's allegations were not credible.   The ALJ set forth a detailed discussion of the medical evidence.   She pointed out that there were lengthy periods when plaintiff had no relevant treatment.   Plaintiff had medical insurance and she did not claim that there was any barrier to obtaining treatment.   Therefore, the ALJ properly relied on this factor.   More importantly, the ALJ relied on the fact that there was scant mention in the medical records of skin lesions or plaques.   Most of the health care providers who mentioned her skin noted that it was unremarkable.   This evidence flatly contradicts Ms. Sydow's testimony.

Plaintiff does not suggest that the ALJ overlooked any medical evidence that documented the presence of plaques, or, as she called them, "pus balls."   The ALJ accurately characterized the medical evidence, and she was entitled to rely on the fact that the objective medical contradicted plaintiff's testimony.   The ALJ may rely on conflicts between plaintiff's testimony and the objective record, as "discrepancies between objective evidence and self-reports may suggest symptom exaggeration." *Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008).   However, if the adverse credibility finding is premised on inconsistencies between plaintiff's statements and other evidence in the record, the ALJ must identify and explain those inconsistencies. *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001).   The ALJ identified the obvious inconsistency between plaintiff's statements and the observations of the health care providers.

14

The ALJ gave additional reasons for her credibility findings.  Plaintiff had never sought specific medical care for her alleged skin outbreaks, the alleged onset date is not supported by any particular evidence, and her health care providers indicated that she had responded well to treatment for her arthritis.

It is clear that the ALJ considered the relevant factors.  Plaintiff does not take issue with any of the reasons cited by the ALJ.   Rather, she argues generally that the ALJ should have more thoroughly analyzed her credibility, which is tantamount to no argument at all.

The ALJ's credibility assessment need not be "flawless;" it passes muster as long as it is not "patently wrong."  *Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009).  The analysis is deemed to be patently wrong "only when the ALJ's determination lacks any explanation or support."  *Elder v. Astrue*, 529 F.3d 408, 413-414 (7th Cir. 2008).   Here, the analysis is far from patently wrong.  It is evident that ALJ Loewy considered the appropriate factors and built the required logical bridge from the evidence to her conclusions about plaintiff's testimony.  *Castile v. Astrue*, 617 F.3d 923, 929 (7th Cir. 2010).   Therefore, her credibility determination stands.

In the final analysis, plaintiff's arguments are a plea to the Court to reweigh the   evidence, which is far beyond this Court's proper role.   The most that can be said is that   reasonable minds could differ as to whether Ms. Sydow was disabled during the relevant time period.   In that circumstance, the ALJ's decision must be affirmed if it is supported by substantial evidence.  And, the Court cannot make its own credibility determination or substitute its judgment for that of the ALJ in reviewing for substantial evidence.   *Shideler,* 688 at 310; *Elder,* 529 F.3d at 413.

## Conclusion

After careful review of the record as a whole, the Court is convinced that ALJ Loewy

committed no errors of law, and that her findings are supported by substantial evidence. Accordingly, the final decision of the Commissioner of Social Security denying Cynthia L. Sydow's application for disability benefits is **AFFIRMED**.

The Clerk of Court shall enter judgment in favor of defendant.

**IT IS SO ORDERED.**

**DATED:** April 16, 2015

s/ Staci M. Yandle
STACI M. YANDLE
DISTRICT JUDGE